USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/27/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
HARBI HUSSEIN, on behalf of himself and as a representative of the ESTATE OF SAADO ALI WARSAME, AYANLE ALI, on behalf of himself and as a representative of the ESTATE OF ABDULLAHI ALI ANSHOOR, MARYAN ALI and RIYAK ALI,

                                      Plaintiffs,

                              -against-

DAHABSHIIL TRANSFER SERVICES LTD., DAHABSHIL, INC., DAHAB-SHIL, INC., and DAHABSHIIL PVT,

                                      Defendants.
------------------------------------------------------------- X

15-CV-9623 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

This is a civil action to recover damages for the murder of two United States citizens, Saado Ali Warsame and Abdullahi Ali Anshoor. Warsame and Anshoor were killed in Mogadishu, Somalia in 2014. The First Amended Complaint ("FAC") alleges that they were murdered by the terrorist organization Harakat al-Shabaab al-Mujahideen or "al-Shabaab." Plaintiffs, relatives and representatives of the decedents, bring claims under the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333, against four entities that are members of the Dahabshiil hawala network ("Dahabshiil" or the "Network"). A hawala is a network-based method of transferring funds common in the Middle East and South Asia.[1] The FAC alleges that the Defendants conspired to provide material support to al-Shabaab directly through financial

---

[1] *See generally United States v. Banki*, 685 F.3d 99, 103 (2d Cir. 2011); Patrick M. Jost, Financial Crimes Enforcement Network, Dep't of Treasury, The Hawala Alternative Remittance System and its Role in Money Laundering (2000).

contributions and indirectly by facilitating the transfer of funds to al-Shabaab from terrorist financiers abroad.

Before the Court are the Defendants' motions to dismiss under Rule 12(b)(1), Rule 12(b)(2), and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkts. 45, 49. Two of the Defendants operate abroad: Dahabshiil Transfer Services Ltd. ("DTS") is based in London; and Dahabshiil PVT ("PVT") is based in Somalia and Somaliland. DTS and PVT argue that the Court does not have personal jurisdiction over them because they do not operate in New York, or in the United States more generally. *See* Foreign Defs.' Mem. (Dkt. 46) at 13-20. Dahabshil, Inc. and Dahab-Shil, Inc. are U.S.-based members of the Network. They argue that the FAC does not plausibly allege the existence of a conspiracy nor the elements of a claim under the ATA because it does not allege that the Defendants knowingly provided aid to al-Shabaab or that the Defendants proximately caused the murder of Warsame or Anshoor. *See* U.S. Defs.' Mem. (Dkt. 50) at 19-28. DTS and PVT also join in that argument.

For the reasons that follow, the Court GRANTS the Defendants' motions to dismiss under Rule 12(b)(6).

## BACKGROUND

**1.    Statutory Framework**

The ATA provides a cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Liability under the ATA has three formal elements: "unlawful *action*, the requisite *mental state*, and *causation*." *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 514 (S.D.N.Y. 2014) (quoting *Gill v. Arab Bank, PLC* (*Gill II*), 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) (Weinstein, J.)). "Unlawful action," or an act of "international terrorism," is defined by Section 2331(1) to include "activities that—[(A)] involve violent acts or acts dangerous to

human life that are a violation of the criminal laws of the United States" and appear to be intended to coerce or intimidate a civilian population or influence government conduct or policy. 18 U.S.C. § 2331(1)(A)-(B). Because Section 2333(a) creates a cause of action for intentional torts, plaintiffs must establish, at a minimum and as relevant here, that the defendants provided material support knowing that the "recipient of the material support . . . is an organization that engages in terrorist acts, or [] must be deliberately indifferent to whether or not the organization does so."[2] *In re Terrorist Attacks on Sept. 11, 2001* (*Terrorist Attacks II*), 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 428 (E.D.N.Y. 2013); *see also Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 693 (7th Cir. 2008) (*en banc*) (describing *mens rea* standard under Section 2333 by analogy to traditional tort liability principles). Courts have also interpreted the ATA to require some evidence that the defendant was aware of a "substantial probability" that Americans would be injured by the "unlawful acts" involved, *see Gill v. Arab Bank, PLC* (*Gill I*), 893 F. Supp. 2d 474, 506 (E.D.N.Y. 2012) (Weinstein, J.), although plaintiffs dispute this point, *see* Pls.' Opp. (Dkt. 56) at 23. A Section 2333(a) plaintiff must also establish that the unlawful act of international terror was a proximate cause of his injury. *See Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013) (Section 2333(a) requires showing of proximate cause); *Gill I*, 893 F. Supp. 2d at 507.[3]

---

[2] Courts have variously referred to this standard as requiring evidence of "knowing" conduct or "reckless" conduct. Because knowledge may be imputed from evidence that a defendant was "willfully blind" to the facts, the difference in terminology is primarily semantic. *See Strauss*, 925 F. Supp. 2d at 427-28 (comparing the Seventh Circuit's "recklessness" standard to the "deliberate indifference" or "willful blindness" standard in *Linde v. Arab Bank, PLC* (*Linde I*), 584 F. Supp. 2d 585, 587 n.8 (E.D.N.Y. 2005), and concluding that there is no substantive difference). By whatever name, at a minimum, Defendants must be aware of a "substantial probability" that their acts aided terrorism. *See id.* The parties agree on the substance of the *mens rea* standard to be applied by the Court. *See* Pls.' Opp. at 17-18 & n.7 (noting that "the cases agree" that the ATA requires allegations of intentional, knowing, or deliberately indifferent conduct).

[3] Plaintiffs are not required to establish "but-for" causation. *See Linde v. Arab Bank, PLC* (*Linde II*), 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015).

The acts of international terrorism alleged in the FAC are violations of the material support statutes, 18 U.S.C. §§ 2339A, 2339B, 2339C. The parties agree that providing material support to a foreign terrorist organization ("FTO") constitutes unlawful action under the ATA. Because the material support statutes require the same (or a greater) showing of *mens rea* than does Section 2333(a), a plausible allegation of a violation of the material support provisions establishes both "unlawful action" and scienter for purposes of Section 2333(a). *See Gill I*, 893 F. Supp. 2d at 504.

The material support provisions have other idiosyncratic elements, however. Section 2339A criminalizes the provision of "material support" "knowing or intending" that it will be used in aid of a violation of one of several criminal statutes, including as relevant here, the murder of U.S. nationals abroad. 18 U.S.C. § 2339A(a) (enumerating 18 U.S.C. § 2332(a)(1)).[4] Section 2339A also requires evidence that the defendant knew or intended that its financial services would "generally facilitate" the FTO's activities, but there is no requirement that the defendant specifically know or intend to support a particular terrorist attack. *Linde I*, 384 F. Supp. 2d at 586 n.9. Section 2339B prohibits "knowingly provid[ing]" material support to an FTO. 18 U.S.C. § 2339B(a)(1). Section 2339(B) requires knowledge of the FTO's "connection to terrorism" but "not specific intent to further the organization's terrorist activities." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010). And, finally, Section 2339C targets the

---

[4] Material support is defined as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

18 U.S.C. § 2339A(b)(1). Financial services, including routine banking services, can qualify as material support. *See Weiss v. Nat. Westminster Bank PLC*, 453 F. Supp. 2d 609, 625 (E.D.N.Y. 2006).

financing of terrorist acts: it prohibits "unlawfully and willfully" providing or collecting the transfer of monies with "knowledge that such funds" are to be used to carry out a violent act intended to "intimidate a population, or to compel a government or an international organization" to act or abstain from acting. *Id.* at § 2339C(a)(1). Section 2339C requires allegations that the defendant knew or was willfully blind to the fact that the funds provided to the FTO would be used to finance terror and had the ultimate goal of intimidating or coercing a civilian population or of influencing the policy of a government by intimidation and coercion. *Wultz v. Islamic Repub. of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010); *see also Ahmad v. Christian Friends of Israeli Communities*, 13-CV-3376 (JMF), 2014 WL 1796322, at *3 (S.D.N.Y. May 5, 2014).

2. **Factual allegations**

Dahabshiil is the largest hawala network in Africa. FAC ¶ 33. The Network functions through a system of off-setting accounts among its branches. *Id*. at ¶ 60. According to the FAC, customer transfers are credited or debited in the accounts of the originating branch and its correspondent branch at the point of delivery. *Id.* The funds are available almost immediately. *Id.* Unlike the international wire transfer system, however, no money is transferred in real time. *Id.*; *see generally* Joust *supra* at 5. Instead, branches periodically settle their accounts through traditional wire transfers using commercial banks. FAC ¶ 60. The FAC alleges that DTS controls the other members of the Network and provides operational support, including the information technology that is the backbone of the Network. *Id.* at ¶¶ 39, 60.

The FAC alleges that the Defendants conspired to provide material support to al-Shabaab. Al-Shabaab is a terrorist organization operating primarily in Somalia. Since its formation in 2006, al-Shabaab has, at various points, controlled substantial portions of that country. FAC ¶ 27. In February 2008, the United States government designated al-Shabaab as an FTO and "Specially Designated Global Terrorist entity." *Id.* at ¶ 29.

According to the FAC, the Defendants have participated in the conspiracy in two ways: First, the Defendants—at the direction of DTS—facilitated transfers of money to al-Shabaab through the Network by intentionally adopting a policy of lax anti-money laundering and "know your customer" procedures ("AML" and "KYC," respectively).  Second, the Defendants have provided direct support to terrorist causes through financial contributions and by hiring individuals associated with terrorist groups, though not exclusively al-Shabaab.

Plaintiffs' allegations of tacit support for al-Shabaab are based on a series of four small transfers from individuals in the United States to individuals allegedly associated with al-Shabaab in 2009 and a 2012 United Nations report describing a plot by individuals in Qatar to send funds to al-Shabaab between 2011 and 2012.  In 2011, a Minnesota jury convicted two Somali immigrants of transferring funds to al-Shabaab.  Four of the transfers were sent through the U.S.-based Dahabshiil entities.  FAC ¶¶ 53-54.  The transfers were each between $200 and $300 and totaled $950.  *Id.* at ¶ 53.  In two instances, the transfers were sent to individuals who used pseudonyms to avoid detection.  *Id.*  The other two transfers were made to associates or alleged aides to al-Shabaab operatives.  *Id.*  The U.N. Report is less detailed.  It describes a plan by Somali businessmen in Qatar to fund an assassination campaign by an al-Shabaab special unit known as the Amniyat.  FAC ¶¶ 50-52.  The report says that some of the funds were transferred to Somalia through unnamed Dahabshiil entities, but it does not include any information about the timing of the transfers, the amounts, whether pseudonyms were used, or whether the transfers had any red flags indicative of an illicit purpose.[5]  *Id.* (quoting United Nations, Security Council,

---

5   The facts are described in a single paragraph of the U.N. Report, reproduced in full below:

> The Monitoring Group was also provided with confidential information regarding the preparation at the end of 2012 and the partial execution of a large-scale assassination operation by an *Amniyat* cell in Mogadishu. The objective was to mobilize a team of 25 *Amniyat* operatives to conduct a wave of assassinations of national intelligence officers and members of the Federal parliament. To that end, money was collected amongst supporters of Al-Shabaab within the Somali business

6

*Report of the Monitoring Group on Somalia and Eritrea Pursuant to Security Council Resolution 2060*, U.N. Doc. S/2013/413 (July 12, 2013)).

The FAC also includes facts intended to show that Dahabshiil was on notice that the Network could be used to transfer funds to terrorists but failed to institute proper controls. According to the FAC, the U.S.-based Defendants will transfer up to $2,000 to an individual in Somalia without recording the identity of the transferor, FAC ¶ 58, and PVT allows a transferee to collect such transfers without presenting identification, so long as the transferee is judged to be "credible" by the local PVT office, *id.* at ¶ 61. Between 2011 and 2015, five western banks refused to work with Dahabshiil, allegedly because of concerns that the Network could be used for illicit purposes. *Id.* at ¶¶ 68-71. Finally, in 2013, Danish financial regulators concluded that there was a "high risk" of the Network being "misused" to launder money or finance terror. *Id.* at ¶ 65.

The FAC's other allegations are intended to show a more direct connection to terrorist entities. The former branch manager for Dahabshiil in Karachi, Pakistan was detained by the U.S. Department of Defense at Guantanamo Bay. FAC ¶¶ 45-46. A 2008 Defense Department assessment concluded that the detainee had used the Network to send money to al-Qaeda at some unspecified time before November 2002. *Id*. The FAC does not explain the connection between this detainee and any of the four Dahabshiil Defendants, or the relationship between support for al-Qaeda by a manager of the branch office in Karachi before 2002 and an alleged present-day conspiracy to fund al-Shabaab. The FAC also references the arrest of a deputy manager for

---

community in Qatar and sent via Dahabshil, a money remittance company, to Mogadishu, where it was received by the *Amniyat* Finance Officer in Mogadishu, Ali Mohammed Ali 'Abdullahi', and delivered to the *Amniyat* commander in charge of the operation.

U.N. Report ¶ 26. The U.N. Report is incorporated into the FAC. The FAC contains no other facts relative to these transfers.

Dahabshiil's branch in South Africa, allegedly on charges that he recruited young men to al-Shabaab.  *Id.* at ¶ 56.  Lastly, the FAC alleges that PVT makes payments directly to al-Shabaab so that its local offices can operate without interference in the areas of Somalia controlled by al-Shabaab.  *Id.* at ¶ 55.  In July 2014, al-Shabaab allegedly closed branches of PVT in two regions of Somalia because it had stopped making payments to al-Shabaab.  *Id.*

## DISCUSSION

In evaluating a motion to dismiss, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Meyer v. JinkoSolar Holdings Co.,* 761 F.3d 245, 249 (2d Cir. 2014) (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 709 F.3d 109, 119 (2d Cir. 2013) (alterations omitted)).  Nonetheless, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "Plausibility" is not certainty.  *Iqbal* does not require the complaint to allege "facts which can have no conceivable other explanation, no matter how improbable that explanation may be."  *Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353, 360 (2d Cir. 2013).  But "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, and "[courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation,'" *Brown v. Daikin Am. Inc.,* 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Twombly,* 550 U.S. at 555 (other internal quotations marks and citations omitted)).

Plaintiffs bear the burden of establishing personal jurisdiction.  When no discovery has taken place, however, a plaintiff need only make a *prima facie* showing of jurisdiction—through "legally sufficient allegations"—to survive a Rule 12(b)(2) motion.  *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 452 (S.D.N.Y. 2005).  The Court will construe "all pleadings and affidavits

in the light most favorable to the plaintiff" and resolve "all doubts in the plaintiff's favor." *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citations omitted). On the other hand, the Court need not accept either party's legal conclusions as true, nor will it draw "argumentative inferences" in either party's favor. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

**1.      Conspiracy Liability**

In *In re Terrorist Attacks on Sept. 11, 2001* (*Terrorist Attacks III*), the Second Circuit held that Section 2333(a) does not provide a cause of action for "secondary" liability. 714 F.3d 118, 123 (2d Cir. 2013); *see also Rothstein*, 708 F.3d at 97. Defendants argue that the FAC must be dismissed because the conspiracy alleged in the FAC asserts a claim for secondary liability. U.S. Defs.' Mem. at 16; Foreign Defs.' Mem. at 14-17. The viability of this legal theory is a threshold issue in this case and the existence of a conspiracy is also one of, if not the primary, asserted grounds for personal jurisdiction over the foreign Defendants.[6] *See generally In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262 (NRB), 2015 WL 4634541, at *23 (S.D.N.Y. Aug. 4, 2015) (personal jurisdiction may be based on jurisdiction over a co-conspirator because co-conspirators "are deemed to be each other's agents." (citing *Chrysler Capital Corp. v. Century Power Corp.,* 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991))).

Each of the material support provisions explicitly imposes liability for conspiring to provide aid to foreign terrorists. As the Seventh Circuit has explained, the inclusion of

---

[6]      Whether the FAC plausibly alleges a conspiracy is dispositive. Although Plaintiffs assert other bases for personal jurisdiction over the foreign Defendants, plausible allegations of a conspiracy to violate the material support provisions are necessary for the FAC to survive Defendants' motions to dismiss under Rule 12(b)(6). Although the Rule 12(b)(6) and Rule 12(b)(2) standards are slightly different, courts in this district have jumped to the Rule 12(b)(6) analysis of a conspiracy, reasoning that failure on those grounds makes an analysis of the conspiracy for personal jurisdictional purposes unnecessary. *Cf. In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 2015 WL 4634541, at *24 (merits conspiracy analysis applies to jurisdictional analysis as well).

9

conspiracy liability in these provisions makes it practically irrelevant in a case such as this one whether secondary liability is authorized under Section 2333(a).[7] *See Boim*, 549 F.3d at 691. For example, Section 2339B imposes liability on "[w]ho[m]ever knowingly provides material support or resources to a foreign terrorist organization, *or attempts or conspires to do so*." 18 U.S.C. § 2339B(a)(1) (emphasis added). Section 2339A and Section 2339C include similar language. Thus, it is not correct to say that a defendant liable for conspiracy under Sections 2339A-C is a "secondary" violator of Section 2333(a). By virtue of the statutory incorporation of Sections 2339A-C into the definition of "international terrorism" in Section 2331, a person who conspires to violate Sections 2339A-C is a primary violator of Section 2333(a).

Although the Second Circuit has not considered the theory of liability described in *Boim III*, other district courts well-versed in this area of the law have previously adopted the same theory in connection with claims for aiding-and-abetting liability. In *Gill I*, Judge Weinstein explained that:

> In the ATA context the secondary liability problem may be of little practical importance. The federal anti-terrorism laws generally criminalize providing material support to terrorists and terrorist groups; a number of statutes provide for what is effectively aiding-and-abetting liability in the terrorism context. *See* 18 U.S.C. §§ 2339A, 2339B, 2339C. This point was recognized explicitly by the en banc majority in *Boim* . . . [W]hile the standalone aiding and abetting claim is dismissed, the functionally equivalent material support concepts provide grounds to support the other claims in the complaint.

---

[7] In 2016, Congress amended Section 2333 to provide for liability "as to any person who . . . conspires with the person who committed []an act of international terrorism." 18 U.S.C. § 2333(d); *see generally* the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. 114-222, 130 Stat. 852 (2016). The parties disagree as to whether JASTA's revisions to Section 2333(d) provide for conspiracy liability in this case. The Court need not reach that issue because it concludes that a conspiracy may be alleged via the underlying material support offenses. The Defendants do not argue that JASTA has any impact on the viability of that theory. Moreover, such a result would be at odds with JASTA's clearly articulated purpose to expand liability under Section 2333. *See* JASTA, Pub. L. 114-222 § 2, 130 Stat. 852, 852 (2016).

893 F. Supp. 2d at 502.  The Court agrees with Judge Weinstein.  Were Plaintiffs able plausibly to allege a conspiracy to provide material support, that would potentially give rise to a civil claim under Section 2333(a).

## 2. Allegations of a Conspiracy

Plaintiffs do not plausibly allege any facts from which the Court could infer that the Defendants were aware of, or deliberately indifferent to, transfers of money to al-Shabaab using the Network—a necessary element of a claim under the ATA.  Taken as a whole, and read most charitably, the FAC alleges plausibly that the Defendants are aware of the risk that their network could be used to transfer funds to al-Shabaab.  But the FAC does not allege any instance in which Dahabshiil has transferred funds to al-Shabaab under circumstances that even suggest it was aware (or ignored a substantial possibility) that the funds were intended for al-Shabaab.

Over the past decade courts in this district and the Eastern District of New York have considered a number of claims that financial institutions provided services to terrorist groups and their affiliates.  While these cases do not establish minimum facts necessary plausibly to allege a violation of the material support statutes, they illustrate the circumstances in which an inference of knowing or deliberately-indifferent conduct is plausible.  In *Gill*, the plaintiffs identified accounts maintained by the defendant, Arab Bank, in the name of well-known Hamas operatives, some of whom were specially designated by the United States as members of the group. *Gill I*, 893 F. Supp. 2d at 486.  The bank also provided services to organizations that had been publicly identified as being affiliated with Hamas. *Id.*  Likewise, in *Weiss* and *Strauss* there were non-conclusory allegations that the defendant banks were on notice of the terrorist connections of specific customers at the time of the alleged transfers.  *See Weiss*, 453 F. Supp. 2d at 626-27 (customers were designated as Hamas fronts by the Israeli government); *Strauss v. Credit Lyonnais, S.A.*, No. 06-CV-702 (CPS), 2006 WL 2862704, at *14-15 (Oct. 5, 2006) (bank was

11

aware of "unusual activity" in accounts belonging to customers designated by Israel as connected to Hamas); *see also Wultz*, 755 F. Supp. 2d at 50 (Israeli authorities reported concerns to bank supervisors regarding customers and transfers). Allegations that the defendants cleared suspicious transfers may also suggest an inference of knowledge or recklessness. *See Strauss*, 2006 WL 2862704, at *14 (accounts involved "large transfers of money to the West Bank and Gaza Strip during the highly publicized intifada"); *Wultz*, 755 F. Supp. 2d at 52 (transfers were made in cash in large, round numbers without any apparent business purpose). Providing unusual services that are not part of the defendant's ordinary course of business might also raise red flags. *See Linde I*, 384 F. Supp. 2d at 588.

By comparison, an inference of knowing or deliberately-indifferent support is generally implausible when the only allegations are that the defendants provided "routine" banking services unaccompanied by any allegations tending to show that the defendants had reason to believe that their customers were terrorists or were assisting terrorists. *See Terrorist Attacks I*, 718 F. Supp. 2d at 489 ("Generally, in the absence of any allegations that a bank has ties to a terrorist organization, or that it knew or had reason to believe that the monies it was processing through the bank would be used to carry out terrorist attacks on civilian targets, noncompliance with banking laws and industry standards will not alone render a bank liable for the violent attacks committed by a terrorist organization who benefitted, in some general, nondescript manner, from the monies passing through the bank during the performance of routine banking services.").

The FAC lacks any similar allegations of knowing or deliberately-indifferent assistance to al-Shabaab. The FAC does not allege any instance in which any of the Defendants transferred money to al-Shabaab while on notice of the customer's or transferee's terrorist affiliations or under other suspicious circumstances that would raise "red flags." The four transfers identified

during the 2011 Minnesota prosecution involve small amounts, each $300 or less. FAC ¶ 53. They were not sent to recipients who were publicly identified as associated with al-Shabaab— two were sent to individuals who used pseudonyms and the others were sent to alleged associates of members of al-Shabaab. *Id.* The FAC does not allege that the transfers had any red flags that might have put Defendants on notice that they were intended for al-Shabaab. Similarly, the facts of the Amniyat transfers alleged in the FAC are too sketchy for the Court to infer that any Dahabshiil entity was aware of the nature of the transactions. The U.N. Report does not say which Dahabshiil branch was involved (only four are defendants in this case), who made the transfers, in what amounts, or whether they were sent in the name of individuals known to be associated with al-Shabaab. U.N. Report ¶ 26.

The FAC's allegations that banks and regulators have criticized Dahabshiil's AML policies are not a substitute for allegations that the Defendants transferred funds knowing or deliberately indifferent to the fact that they were destined for al-Shabaab. The FAC alleges that Danish officials concluded in July 2013 that "Dahabshiil" had inadequate AML policies that posed a "high risk" of misuse. FAC ¶ 65. The FAC does not allege that the four defendants in this case—none of which is Dahabshiil's Danish branch—refused to implement required AML policies despite these warnings or that they had similarly inadequate AML policies. The FAC also fails to connect this warning or the events that precipitated the warning to any transfers to al-Shabaab. The FAC alleges that the U.S.-based Defendants will transfer less than $2000 without requiring identification from the transferor, but the FAC does not link that allegedly inadequate policy to any particular transfer that could constitute "material support" for al-Shabaab. *Id.* ¶ 58.[8] Although the FAC discusses four small transfers in 2009, described *supra*,

---

[8] Without such additional information, the Defendants' policy, standing alone, is hardly suspicious inasmuch as there is no known requirement in the United States to obtain identification from people who transfer such small

13

the FAC affirmatively indicates that the transferors were known to the U.S.-based Defendants, making the policy of not requiring identification irrelevant to any risks associated with those transfers.

Likewise, the FAC's allegations that five commercial banks stopped doing business with Dahabshiil between 2011 and 2015, *id.* ¶¶ 67-71, do not relate to any transactions that Plaintiffs say benefitted al-Shabaab.[9]  Taken as a whole, and read charitably, the FAC alleges that Dahabshiil knows that its business operates in a dangerous country and involves potentially risky transactions.  But that is not the same as knowing or deliberately-indifferent support for terror, and the FAC does not allege any instance of actual misuse of the Network under circumstances suggesting that the Defendants knew about or were deliberately indifferent to that misuse.

The FAC's allegations of direct support for al-Shabaab do not have a connection to the alleged conspiracy among the Defendants.  Conspiracy liability requires evidence "that the conspirators agreed on 'the essence of the underlying illegal objective[s] and the kind of criminal conduct in fact contemplated.'"  *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 114 (2d Cir. 2008) (quoting *United States v. Salameh*, 152 F.3d 88, 151 (2d Cir. 1998) (internal quotation marks omitted)).  The FAC alleges that several Dahabshiil employees (of which Dahabshiil entity is not always clear) have previously supported terrorist organizations, FAC ¶¶ 44-48, 56, but does not explain how that is indicative of the alleged conspiracy to support al-Shabaab, how the Defendants were involved, whether the support was at the same time as their employment by Dahabshiil, or whether their support was even known to Dahabshiil.

---

amounts of money.  As to the recipients of the funds, the Court notes the practical reality that the sort of proofs of identification that are commonly available in the United States and other first world countries are not always available in third world countries like Somalia.

[9]     Moreover, one of the banks that terminated its relationship with Dahabshiil did so not because of fears of inadequate controls but because of "the inherent risks of doing business in Somalia."  FAC ¶ 69.

Although the FAC does allege, in an entirely conclusory manner, that PVT may have, at some unspecified time, made extortion payments to al-Shabaab, *id.* ¶ 55, it is not clear how those payments were in furtherance of the alleged conspiracy among these four defendants. Moreover, the allegations are highly generalized and lack details from which the Court might infer that the other Defendants are aware of the payments.

## CONCLUSION

The Defendants' motions to dismiss, docket entries 45 and 49, are GRANTED. Plaintiffs requested leave to amend in their opposition, but did not attach a proposed second amended complaint. Given the FAC's fundamental flaws and the fact that Plaintiffs have already amended their complaint once, the Court finds that leave to amend would be futile in this case. Accordingly, the FAC is DISMISSED WITH PREJUDICE. The Clerk of Court is respectfully directed to enter judgment in favor of the Defendants and terminate the case.

**SO ORDERED.**

Date: **January 27, 2017**
New York, New York

_____
**VALERIE CAPRONI**
**United States District Judge**